# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

GREAT LAKES COMMUNICATION
CORPORATION and SUPERIOR TELEPHONE
COOPERATIVE,

        Plaintiffs,

vs.

IOWA UTILITIES BOARD, Utilities Division,
Department of Commerce; ROBERT B.
BERNTSEN, KRISTA K. TANNER, and
DARRELL HANSON, in their Official
Capacities as Members of the Iowa Utilities
Board and not as Individuals; NEUSTAR, INC.,
the North American Numbering Plan
Administrator and Pooling Administrator;
QWEST COMMUNICATIONS COMPANY,
LLC; and SPRINT COMMUNICATIONS
COMPANY, LP;

        Defendants.

No. C09-4085-DEO

**REPORT AND
RECOMMENDATION ON
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

---

## I.  INTRODUCTION

This matter is before the court on a number of preliminary motions filed by the
parties.  The case was filed by the plaintiffs Great Lakes Communication Corporation
("Great Lakes") and Superior Telephone Cooperative ("Superior") against the defendants
Iowa Utilities Board ("IUB"); Robert B. Berntsen, Krista K. Tanner, and Darrell Hanson,
in their official capacities as members of the IUB (these individual defendants and the IUB
are collectively referred to herein as the "IUB defendants"); and Neustar, Inc.
("Neustar"), as the North American Numbering Plan Administrator and Pooling
Administrator.  The plaintiffs seek "declaratory, temporary, preliminary and permanent
injunctive relief against the enforcement" of a Final Order issued by the IUB on

September 21, 2009 (the "IUB Order") in the matter of *Qwest Communications Corp. v. Superior Telephone Cooperative*, Doc. No. FCU-07-2 (the "*Qwest* action"). *See* Doc. No. 1-2.

Qwest Communications Company, LLC ("Qwest") and Sprint Communications Company, LP ("Sprint") filed motions to intervene in the case, Doc. Nos. 21 & 34, and the IUB defendants filed a motion to join Qwest and Sprint, as well as the Consumer Advocate Division of the Iowa Department of Justice (the "CAD"), as necessary parties. Doc. No. 33. The court granted the motions to intervene, and granted the motion to join parties as to Qwest and Sprint, but denied the motion as to the CAD. Doc. No. 38.

Along with the Complaint, Great Lakes filed a motion for preliminary injunction and temporary restraining order. Doc. No. 6. Judge Donald E. O'Brien granted the plaintiffs' *ex parte* request for a Temporary Restraining Order, Doc. No. 11, and the motion for a preliminary injunction was referred to the undersigned for a hearing and preparation of a report and recommended disposition. Doc. No. 12. After entry of the temporary restraining order, Great Lakes supplemented its motion to narrow the scope of its request for temporary and preliminary injunctive relief. Doc. No. 43. The motion, as supplemented, has been resisted by the defendants Berntsen, Tanner, and Hanson, Doc. No. 49; Qwest, Doc. No. 58; and Sprint, Doc. No. 52.

Qwest filed a motion to dismiss this action, or alternatively to either transfer the case to the Southern District of Iowa or reassign the case to Judge James E. Gritzner. Doc. No. 39. Qwest also filed a motion to dissolve the temporary restraining order issued by Judge O'Brien. Doc. No. 50. These motions have been resisted, Doc. Nos. 53 & 59, and both motions have been referred to the undersigned for a report and recommendation, Doc. Nos. 41, 56.

The pending motions came on for hearing before the undersigned on November 13, 2009. George David Carter, Jr., Jeana L. Goosmann, Jeremy J. Cross, Ross Allen Buntrock, and Stephanie Ann Joyce appeared on behalf of Great Lakes and Superior.

David Jay Lynch and Jennifer Smithson appeared on behalf of the IUB defendants. John P. Corrado and Joseph G. Gamble appeared on behalf of Neustar. Charles W. Steese and Michael P. Jacobs appeared on behalf of Qwest. Brett Alan Dublinske appeared on behalf of Sprint. In addition, Robert Salerno, Alex Konde, and Kimberly Miller appeared briefly by telephone on behalf of Neustar.

Great Lakes called three witnesses to testify at the hearing: John Manning, the senior director of the North American Numbering Plan Administrator for Neustar (who testified by telephone); Joshua Nelson, the founder and president of Great Lakes; and David Erickson, the president of Great Lakes's largest customer, Free Conferencing Corporation. Qwest called Jeff Owens, a systems engineer and telecommunications industry expert employed by Qwest.

To help follow the alphabet soup of acronyms that are used describe the entities involved in this dispute, the court provides the following dictionary:

**FCC** (Federal Communication Commission): the federal regulatory entity with jurisdiction over interstate telephone service.

**FCSC** (free calling service company[1]): a company that provides customers with free telephone conferencing services, chat rooms, or some similar service.

**IUB** (Iowa Utilities Board): the Iowa state regulatory entity with jurisdiction over intrastate telephone service in Iowa.

**IXC** (interexchange carrier): a long-distance telephone company, such as Qwest, Sprint, or AT&T.

**LEC** (local exchange carrier): a local telephone company, such as Great Lakes or Superior.

**NANPA** (North American Numbering Plan Administrator): a non-governmental entity to whom the FCC has delegated the authority to administer the numbering system.

---

[1]The acronym "FCSC" is not used in the telecommunications industry, but it was used by the IUB to describe companies that provide free conference calling and chat line services to the public.

## II. FACTUAL BACKGROUND

### A. The Underlying Dispute

The court previously summarized the background of the case in its order on Qwest's and Sprint's motions to intervene and the IUB defendants' motion to join Qwest and Sprint as indispensable parties. Doc. No. 38. The summary is repeated here for the convenience of the district court in reviewing this Report and Recommendation:

> The world of telecommunications regulation is divided into two hemispheres: interstate and international telecommunications are regulated by the Federal Communications Commission ("FCC") pursuant to authority delegated by Congress. 47 U.S.C. § 151. Intrastate telecommunications are regulated at the state level by agencies, like the Iowa Utilities Board ("IUB"), pursuant to authority delegated to them. Iowa Code § 476.1; 47 U.S.C. § 152(b). . . .

> Great Lakes is a "local exchange carrier" ("LEC") [purportedly] providing telephone service to customers in Spencer, Iowa under the Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 153(26). Great Lakes serves customers that provide conference-calling services. Subscribers to the conference-calling services reach the conference-calling "bridges" by dialing a long-distance telephone number and entering an access code. Once connected to the conference bridge, customers can talk to anyone else also connected to the bridge and using the same access code. The conference-calling services are free to the persons calling them, other than the long-distance charges owed to their IXCs [i.e., long-distance companies or "interexchange carriers"].

> To provide service to its conference-calling service provider customers, Great Lakes needs telephone numbers that it can assign. Great Lakes obtains these numbers from the North American Numbering Plan Administrator ("NANPA"), a non-governmental entity to whom the FCC has delegated authority to administer the numbering system for the public switched telephone network. FN1/

>> FN1/ Similarly, the FCC has delegated authority to a Pooling Administrator to

4

administer subsets of telephone numbering resources known as "thousand-number blocks" for the purpose of conserving numbers through "pooling." The "pooling" process allows more than one carrier to share the local exchange prefix ("NXX") that follows the area code ("NPA").

Neustar, Inc. was selected by the FCC to function as both NANPA and the Pooling Administrator.

[Great Lakes] provides access to its local exchange facilities and customers [through which] long-distance companies ("interexchange carriers," or "IXCs") such as Qwest Communications Corporation ("Qwest"), AT&T Corporation ("AT&T"), or Sprint Communications Company, L.P ("Sprint"), can complete telephone calls from their customers to Great Lakes' conference-calling service providers. To compensate Great Lakes for the use of its local exchange facilities, Great Lakes [claims it is entitled to collect] "terminating access charges" from the IXCs. The access charges [allegedly] owed by the IXCs to LECs [allegedly] are included in the service fees the long-distance companies charge their customers.

Great Lakes' access charges are specified in tariffs on file with the FCC and the IUB. Most of the terms of the Great Lakes interstate access tariff mirror those in the National Exchange Carrier Association ("NECA") Access Tariff No. 5. The NECA Access Tariff defines the terms and conditions for interstate access charges for more than 1,000 local exchange carriers. . . . [Footnote omitted.]

[According to Great Lakes,] [t]he terms of the Great Lakes intrastate access tariff adhere closely to the Iowa Telecommunications Association ("ITA") Access Tariff No. 1, except for minor exceptions. The ITA intrastate access tariff defines the terms and conditions for intrastate access charges for over 140 Iowa LECs. . . . [Footnote omitted.] [T]he ITA Access Tariff incorporates the terms and conditions of the NECA Access Tariff No. 5, but provides rates and charges specific to traffic originated and terminated within Iowa.

> [According to Great Lakes], the General Terms and Conditions, including definitions of terms, are identical between the NECA interstate access tariff . . . and the ITA intrastate access tariff. . . .
>
> For more than two years now, Qwest and Sprint have withheld payment of access charges [that Great Lakes claims are] owed to Great Lakes. The IXCs . . . assert[] that Great Lakes' access tariffs do not apply to traffic destined for conference calling providers. The IXCs have taken their complaints to state regulators, like the IUB. In this case, Qwest filed a Complaint at the IUB against [Great Lakes] and seven other Iowa local telephone companies, seeking relief from its obligation to pay intrastate access charges.

Doc. No. 37, pp. 1-3 (quoting Doc. No. 6-3, pp. 3-5 (citations omitted)).

In Great Lakes's supplemental motion for preliminary injunction, it seeks to temporarily enjoin enforcement of "Clause 7" of the IUB Order directing Neustar to reclaim the telephone numbers issued by NANPA to Great Lakes.[2] Doc. No. 43; *see* IUB Order, Clause 7. The IUB Order represents the culmination of an action before the IUB initiated on February 20, 2007, by Qwest against Great Lakes, Superior, and six other local Iowa telephone companies. In the IUB case, Qwest alleged the local telephone companies had violated the terms, conditions, and application of their intrastate tariffs, and sought relief from its obligation to pay intrastate access charges to the local telephone companies. Sprint intervened in the IUB case.[3]

---

[2]The requested injunction is significantly narrower than what was requested in Great Lakes's original motion for temporary restraining order. Great Lakes had sought to enjoin the IUB from enforcing any part of its order.

[3]AT&T Communications of the Midwest, Inc. and TCG Omaha also intervened in the IUB case, but neither of these entities is a party to the present action.

## B. *Great Lakes*

Great Lakes is in the business of providing local telephone service to companies that offer conference calling and chat line services to the public (FCSCs). Its offices are in Spencer, Iowa. Great Lakes has twenty-five to thirty customers, all of which are conference calling companies or chat line providers. It has no customers other than these FCSCs.

Great Lakes's operations are fairly simple. It obtains blocks of local telephone numbers from NANPA, and then assigns them to its FCSC customers. The FCSCs make these numbers available to the public. A caller then can dial one of these numbers, and after entering an access code, be connected to other callers who have dialed the same number and entered the same access code. The callers are not charged for this service, but they have to pay any long distance charges for the call. Great Lakes then bills the long distance carriers (IXCs), such as Qwest or Sprint, for "access charges," and shares what it collects with its FCSC customers.

FCSCs often locate their equipment in small-population, low-call volume locations, such as Spencer, because the allowable access charges in such locations can be substantially higher than in high-call volume locations. Regulators allow higher rates in rural areas because they generally are more expensive to serve. Qwest and Sprint have not paid access charges to Great Lakes for nearly three years, although other IXCs have paid these charges.

Great Lakes was founded in May 2005. On May 27, 2005, the IUB entered an order granting Great Lakes's application for issuance of a certificate of public convenience and necessity pursuant to Iowa Code § 476.29, effective upon Great Lakes obtaining an approved tariff "setting forth the prices, terms, and conditions of its proposed local exchange service in Iowa." On June 10, 2005, Great Lakes filed a tariff for service in the Lake Park exchange, "as described in the local exchange map of Qwest." On June 17, 2005, the IUB issued a certificate of public convenience and necessity authorizing Great

7

Lakes "to furnish local telephone service in the exchanges shown by its tariffs as currently and subsequently approved."

Great Lakes hired a consultant, TELEC Consulting Resources, Inc., to help with the necessary filings. On June 2, 2005, TELEC, on behalf of Great Lakes, sent Neustar a "Statement of Readiness." In the statement, TELEC advised that "the host switch for [Great Lakes] is currently being installed [in Spencer, Iowa]," and Great Lakes "intended to begin the interconnection process with Qwest to handle local traffic and EAS [i.e., Extended Area Service] in the rate center of Lake Park, Iowa." Great Lakes then received a block of telephone numbers for the Lake Park exchange.

On January 23, 2006, Great Lakes filed with the IUB an "Application to Amend Certificate of Public Convenience and Necessity," asking that its certificate be amended "to include all exchanges currently being served by Qwest in the State of Iowa." A representative of the IUB contacted TELEC and informed the consultant that the IUB would be ignoring the application because the existing certificate already covered all exchanges served by Qwest in Iowa. The consultant was advised that if Great Lakes wanted to expand its service area, it should amend its tariff.[4] On January 24, 2006, Great Lakes amended its tariff to include service to both Lake Park and Milford, and the amended tariff was approved.

On February 20, 2006, TELEC, on behalf of Great Lakes, filed a Statement of Readiness with NANPA stating that Great Lakes's "updated local tariff was recently filed

---

[4]This sequence of events is evidenced by an internal IUB email sent on January 26, 2006, which states:

> The certificate for Great Lakes Communications was only issued on July 17, 2005 and it approves listed exchanges in the tariff for the Qwest territory and does not require a modification to the certificate to add Milford, only the TF filing. Record center Lois and Shelly and our Boss are aware of the situation and agreed we can ignore the request to modify certificate and just run the TF thru the process to add Milford. I called the consultant on Jan 25 and informed them that its [sic] just a TF process. Let me know if there are any questions.

Pl's Ex. GL6.

including the exchange of Milford." In the statement, TELEC advised that Great Lakes "intends to serve the Milford, Iowa exchange off their host switch located in Spencer, Iowa."

On March 23, 2006, TELEC sent Neustar a "Part 4" form certifying that the numbers assigned to it for the Milford exchange had been "activated and assignment of the numbers has commenced and are being used for the purpose specified in the original application." Pl's Ex. GL2. On January 17, 2007, TELEC sent Neustar a Part 4 form for the Lake Park numbers. In total, Great Lakes has been assigned 12,000 telephone numbers by NANPA.

According to Great Lakes's Iowa tariff, long distance calls to telephone numbers assigned by Great Lakes are to be switched to the Lake Park or Milford telephone exchanges. However, calls to these numbers never reach either of these locations. Instead, they terminate in Great Lakes's central office in Spencer. In this office, Great Lakes maintains "switches," equipment designed to receive and route telephone calls, and conference calling "bridge" equipment, designed to connect calls together. The switches belong to Great Lakes, but the bridge equipment belongs to Great Lakes's FCSC customers.

Before the calls arrive in Spencer, the calls travel over long distance lines belonging to an IXC, such as Qwest or Sprint, to one of two locations in the Des Moines area. From there, they are sent over a "trunk line" to the switches in Great Lakes's central office in Spencer, where they are "looped" to the appropriate FCSC conference calling bridge located in the same building.

In summary, Great Lakes has no tariff or telephone numbers for the Spencer exchange, and no customers in Lake Park or Milford. Nevertheless, it assigns the telephone numbers it received from NANPA for use in the Lake Park and Milford exchanges to FSCSs who have no presence in either of those locations, or even in the State

of Iowa. It then switches telephone calls placed to these numbers to conference calling equipment belonging to the FSCSs but located in Great Lakes's central office in Spencer.

Joshua Nelson, Great Lakes's founder and president, was asked at the hearing if Great Lakes ever intended to serve customers in the Milford or Lake Park exchanges. He testified, "As we started building our business and building our stuff, we got into litigation and ceased any growth, other – any expansion plans until we were done with litigation." The court finds this testimony was evasive and misleading. From the evidence, it is obvious that Great Lakes never intended to serve individual customers in Milford or Lake Park, and Nelson's intimations to the contrary are simply untrue.[5] The court also finds that Great Lakes misrepresented its intentions to the IUB, th FCC, and Neustar on numerous occasions.

### C. The IUB Order

Because, as discussed more fully below, one of the criteria the court must consider in connection with Great Lakes's motion for preliminary injunction is the probability that it will succeed on the merits, a detailed summary of the IUB's order is warranted here. The IUB summarized the nature of the case as follows:

> In support of its complaint, [Qwest] claims that the Respondents are engaging in a fraudulent practice that involves free conference calls, chat rooms, pornographic calling, podcasts, voice mail, and international calling services. [Qwest] asserts that the Respondents partnered with free calling service companies (FCSCs), which are based in large metropolitan areas such as Los Angeles, California, Las Vegas, Nevada, and Salt Lake City, Utah, and use conference bridges, chat line computers, and routers in Iowa.

---

[5]In a similar vein, on February 14, 2008, Nelson represented to the FCC during a meeting that Great Lakes "currently serves 380 customers, 11 of which are conference calling companies." This was not true. The court does not accept Nelson's testimony that he clarified to the FCC that this was what Great Lakes was planning to do in the future, not what was currently true.

[Qwest] characterizes this practice as "traffic pumping." . . . The scheme originates with local exchange carrier (LEC) members of the National Exchange Carrier Association (NECA) traffic sensitive pool for interstate access charges. The NECA pool generally ensures that a LEC will receive a minimum amount of access revenues, but excess access billings must be shared with other LECs that are also members of the pool. Carriers are allowed to opt-out of the NECA pool but continue to use NECA rates for a maximum period of two years and, during this time, the carriers may keep all of their access billings. After two years, carriers that have opted out of the NECA pool must re-enter the pool or be able to support their rates. Without evidentiary support for the existing rates, the LEC's access rates would be reduced to a level that can be supported.

The fundamentals of traffic pumping begin with an incumbent local exchange carrier (ILEC) with relatively high terminating switched access rates, or a competitive local exchange carrier (CLEC) either benchmarking off a rural ILEC or claiming it is otherwise entitled to charge a higher access rate. The LEC enters into an arrangement with either a broker or directly with one or more FCSCs. The FCSC sends equipment such as conference bridges, chat line computers, or routers to the LEC. The LEC installs that equipment in its central office and then assigns large blocks of telephone numbers to the FCSC. The FCSC advertises the numbers on its Web sites to encourage people from Iowa and throughout the country to call the Iowa numbers to receive the FCSC's calling services free of charge. This allows people to obtain free conference calling, free international calling, and free calling to pornographic content numbers. This scenario creates a substantial increase in the long distance traffic to the LEC's numbers, sometimes 100-fold.

The IXCs [i.e., interexchange carriers] then are required to deliver calls destined for these telephone numbers to the Iowa LECs. The LECs bill the IXCs for that traffic using relatively high interstate switched access rates ($0.05 to $0.13 per minute) that were filed in individual tariffs after opting out of the NECA pool and similarly high intrastate

switched access rates (approximately $0.09 per minute). The Federal Communications Commission (FCC) and the Board allowed high rural LEC access rates based on the assumption that rural LECs receive low long distance traffic volumes due to the small number of end users in their rural exchange areas, which are generally expensive to serve. By opting out of the NECA pool, the LECs are able to keep all of the additional revenue for themselves instead of sharing it with other members of the pool. However, if the LECs stay out of the NECA pool longer than two years, they have to recalculate their interstate rates based on the actual volumes produced by this traffic pumping scheme, which would lower access rates from over $0.05 per minute to fractions of a penny.

IXCs would deliver their long distance customers' calls to these LECs and the LECs would, in turn, bill the IXCs for terminating switched access for all of the calls associated with the FCSCs with whom they did business. After the IXCs pay the access charges, the LECs kickback a portion of those revenues to their FCSC partners as part of a marketing fee. Therefore, traffic pumping presents a situation where LECs bill IXCs for a monopoly service (access) and use a portion of the money generated from the monopoly service to support a competitive service (conference, chat, international, and credit card calling) that generates the abnormally high volume of incoming calls, forcing the IXCs to use and pay for the monopoly service.

In addition, traffic pumping can lead to other schemes, such as the improper backdating of invoices and contracts, traffic laundering, telephone numbering abuses, and potentially misrepresented universal service fund (USF) certifications. For example, LECs failed to bill FCSCs for any local exchange services [and] then issued backdated invoices and contract amendments suggesting that the services were charged but were netted against the FCSCs' marketing services. Other LECs pretended to switch and route the traffic into their own exchanges, but in fact, allowed the traffic to be switched in another LECs' [sic] exchange, even though the first LEC claimed credit for and billed for the traffic.

IUB Order, Doc. No. 1-2, pp. 5-8 (internal citations omitted).

In the complaint Qwest filed with the IUB, it alleged the respondent local telephone companies engaged in traffic pumping in violation of "the switched access services language of the Iowa Telecommunications Association Tariff No. 1 (ITA Tariff) to which the Respondents subscribe." IUB Order, p. 9. Section 1.1 of the ITA Tariff provides as follows:

> "[T]he provision of [switched access service] is specifically intended to provide exchange network access to [interexchange carriers delivering intrastate switched access traffic] for their own use or in furnishing their authorized intrastate services to End Users, and for operational purposes directly related to the furnishing of their authorized services. Operational purposes include testing and maintenance circuits, demonstration and experimental services and spare services."

*Id.* (quoting Qwest's IUB Complaint, p. 12). Qwest alleged the local telephone companies were charging Qwest "for terminating calls via their intrastate tariffs for calls that are actually terminated outside of the [LECs'] local calling areas as specified in their certificates issued pursuant to Iowa Code § 476.29." *Id.* Qwest further alleged the LECs discriminated unlawfully against their other customers by sharing revenues "on a preferential basis with the FCSC customers," and the LECs' arrangements with the FCSCs constitutes "an unfair and unreasonable practice under Iowa Code § 476.5 and 199 IAC 22.1(1) 'a' and 'd.'" *Id.*, pp. 9-10. Qwest, Sprint, and AT&T (collectively, the "IXCs") sought, "in part, refunds of all switched access charges associated with the delivery of intrastate traffic to numbers or destinations associated with FCSCs." *Id.*, p. 12.

The IUB found it had the authority to interpret the LECs' intrastate access tariffs, and to order refunds if appropriate. *Id.* The IUB also found the plaintiffs and the other LEC Respondents to be public utilities subject to rate regulation under Iowa law. *Id.*, p. 12. The IUB divided the issues raised by Qwest into three categories, the first two of which are relevant to consideration of the parties' motions in the present action:

> The first category consists of the alleged tariff violations, the central issue of which is whether the FCSCs are

13

considered end users under the terms of the [LECs] applicable tariffs. This tariff category focuses primarily on the past actions of the parties.

The second category pertains to public interest issues where the IXCs ask the [IUB] to put measures into place that will deter or halt the access pumping schemes that are at issue in this complaint. These issues primarily address prospective matters.

*Id.*, p. 16.

With specific reference to Great Lakes, the IUB held as follows:

[Qwest] asserts that Great Lakes is certificated by the Board, pursuant to Iowa Code § 476.29, to provide telecommunications service only in the Lake Park and Milford, Iowa, exchanges and that Great Lakes' local exchange tariff identifies only Lake Park and Milford as exchanges where Great Lakes provides service. [Qwest] claims, however, that Great Lakes provides all of its services for FCSCs in Spencer, Iowa, despite not being certified to provide service in that exchange. [Qwest] argues that since Great Lakes is not certificated in the Spencer exchange, none of the FCSCs associated with Great Lakes and located in Spencer could be end users of Great Lakes' local exchange service, as required by the terms of the tariff.

*   *   *

Great Lakes responds by stating that the issue of its certification in the Spencer exchange was not included in [Qwest]'s complaint and the Board therefore should not make its determination regarding Great Lakes' assessment of access charges based on the certification issue. Great Lakes argues that it should be considered certificated in all of Qwest Corporation's exchanges in Iowa since that is what it proposed in its original application for a certificate of public convenience and necessity and because it adhered to the Board's certification process in good faith. Great Lakes also argues that it was never informed by the Board that its certificate or tariff were defective.

*   *   *

14

Great Lakes suggested that the issue of its certification in the Spencer exchange was not included in [Qwest]'s complaint and therefore, the Board should not consider the certification issue when determining whether Great Lakes appropriately assessed intrastate access charges. The Board already considered this argument following a motion to exclude evidence filed by Great Lakes and Superior on November 12, 2008. In that motion, Great Lakes and Superior asserted that the scope of their certificates is irrelevant and excludable evidence pursuant to Iowa Rule of Evidence 5.402. The Board issued an order on November 26, 2008, denying Great Lakes and Superior's motion stating that the evidence regarding the certificates was relevant to put [Qwest's] claims into an appropriate context. Because the Board has already ruled that evidence regarding [Great Lakes's] certificate is relevant, the Board will not revisit the issue now.

Great Lakes' certificate of public convenience and necessity clearly states that Great Lakes is authorized to provide service in the exchanges identified in its tariffs. Great Lakes' local exchange tariff states that it provides service in the Lake Park and Milford exchanges. Great Lakes testified that it sought an amendment to its certificate by the Board to allow Great Lakes to provide service in the Spencer exchange, but a review of the certificate indicates that an amendment was not what was required. Instead, Great Lakes needed to amend its tariff. The evidence in the record demonstrates that Great Lakes did not amend its tariff to include the provision of services in the Spencer exchange and, therefore, Great Lakes is not authorized to provide service in the Spencer exchange.

Pursuant to Iowa Code § 17A.14(4), the Board will take official notice of the North American Numbering Plan Administrator (NANPA) records, which show that Great Lakes was assigned telephone numbers only for the Lake Park and Milford exchanges. Based on these records, Great Lakes appears to have been using its Lake Park and Milford telephone numbers to terminate conferencing traffic in the Spencer exchange, where it was not approved to provide service. The fact that Great Lakes was not using Spencer,

Iowa, phone numbers to terminate calls in the Spencer exchange supports the conclusion that Great Lakes is not certificated in the Spencer, Iowa, exchange and that it improperly assessed terminating access charges for intrastate toll traffic terminating in the Spencer exchange.

*Id.*, pp. 50-53 (internal citations omitted).

Qwest asserts that [Great Lakes has] abused numbering resources by not assigning numbers according to FCC requirements. Specifically, [Qwest] states that thousands of phone numbers have been assigned to FCSCs that are not end users. [Qwest] asks the Board to use its authority to reclaim telephone numbers assigned to FCSCs. Specifically, [Qwest] cites to 47 C.F.R., § 52.15(i)"5," which states:

The NANPA and the Pooling Administrator shall abide by the state commissioner's determination to reclaim numbering resources if the state commission is satisfied that the service provider has not activated and commenced assignment to end users of their numbering resources within six months of receipt.

Similarly, Sprint asserts that the Board has authority over the assignment of numbering resources and can remedy the invalid use of numbers. . . . Sprint argues that to the extent some Respondents are providing services in violation of their certificates, the Board should report the information to NANPA or the FCC or should initiate a proceeding to reclaim those numbering resources.

Great Lakes and Superior argue that the assignment and use of telephone numbers is not within the Board's authority and any finding on these matters would be an unlawful action.

Most of the Respondents argue that the Board has limited authority over telephone numbering resources, stating that most of that authority lies with the FCC, yet some of the Respondents agree the Board has delegated authority to reclaim telephone numbers.

With respect to the Board's authority and jurisdiction over telephone numbering administration, 47 U.S.C. § 251(e) provides:

> The Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from designating to State commissions or other entities all or any portion of such jurisdiction.

The NANPA and the Pooling Administrator are the impartial entities designated by the FCC to administer telephone numbering, including the assignment of telephone numbers. State commissioners have also been given a role in numbering administration, including reclamation. Specifically 47 C.F.R. § 52.15(i) grants state commissions the authority to reclaim telephone numbers.

When the NANPA or the Pooling Administrator assigns blocks of telephone numbers, the service provider is required to begin assigning those telephone numbers to end users within six months. Service providers confirm to NANPA or the Pooling Administrator that blocks of telephone numbers have been activated and are being assigned to end users. If a state commission is satisfied that this is not the case, then the state commission can direct the NANPA or Pooling Administrator to reclaim any blocks of numbers that do not satisfy that criteria.

The Board determined earlier in this order that the FCSCs associated with the Respondents are not end users because they did not subscribe to the terms and conditions of the Respondent's tariffs. For Great Lakes in particular, the record in this proceeding indicates that since receiving a certificate in 2005, it has served only FCSCs. Because FCSCs are not end users, Great Lakes should not have numbers

17

activated for pure FCSC use. Therefore, the Board will direct the NANPA and Pooling Administrator to commence reclamation of Great Lakes' numbering resources.

*Id.*, pp. 64-67 (internal citations omitted).

The IUB made the following findings of fact in its Order:

1.    The FCSCs did not subscribe to the [LECs] intrastate switched access or local exchange tariffs.

2.    FCSCs are not end users as defined by the [LECs'] tariffs.

3.    The [LECs] did not net, or offset, fees to the FCSCs.

4.    Certain [LECs] improperly backdated bills and contract amendments to misrepresent transactions with the FCSCs.

5.    The [LECs] did not provide local exchange service to FCSCs through special contract arrangements.

6.    The [LECs] and FCSCs acted as business partners.

7.    The filed tariff doctrine does not apply to the [LECs] in this case.

8.    The sharing of revenues between [the LECs] and FCSCs is not inherently unreasonable, but may be an indication that a particular service arrangement is unreasonable.

9.    At least one [of the LECs] has improperly assigned all of its telephone numbers to FCSCs, which are not end users.

10.   The intrastate toll traffic did not terminate at the end user's premises.

11.   The intrastate toll traffic, including international, calling card, and prerecorded playback calls, did not terminate within the [LECs'] certificated local exchange areas and were not subject to intrastate terminating access charges.

12.   Some [of the LECs] engaged in traffic laundering by billing the terminating access rates of one LEC for calls that terminated in a different LEC's exchange.

13.   Several [of the LECs] partnered with FCSCs that provided free calling services for obscene or pornographic content creating an inability for parents to regulate their children's access to

18

pornographic services over the telephone, which is contrary to the public interest.

*Id.*, pp. 77-79.

The IUB set out the following relevant conclusions of law in its Order:

1.      The [IUB] finds that the [LECs] named in this complaint violated the terms of their access tariffs when they charged [Qwest], Sprint, and AT&T for terminating switched access fees for the traffic at issue int his case.

2.      The [IUB] directs the {LECs] named in this complaint to refund the terminating switched access fees charges associated with the delivery of intrastate interexchange calls to numbers or destinations assigned to or associated with FCSCs and that were paid by [Qwest], Sprint, or AT&T. The [LECs] are also directed to credit [Qwest], Sprint, and AT&T for any such charges that were billed but not paid.

3.      The [IUB] directs [Qwest], Sprint, and AT&T to file their calculations of the amount of terminating switched access fees for the traffic at issue in this case and eligible for refund or credit within 30 days of the date of this order. [Qwest], Sprint, and AT&T are authorized to conduct additional discovery to make those calculations if necessary.

4.      All of the [LECs], with the exception of Great Lakes, are directed to file reports with the [IUB] within ten days of the date of this order stating whether they have any telephone numbering blocks that are not assigned to end users and state how many non-FCSC end users currently have numbers out of each telephone numbering block.

5.      The motion to stay proceedings filed in this docket on August 17, 2009, by Great Lakes and Superior is denied.

        *   *   *

7.      The North American Numbering Plan Administrator and the Pooling Administrator are directed to commence reclamation proceedings of all blocks of telephone numbers assigned to Great Lakes Communications Corp.

*Id.*, pp. 79-81.

### III. MOTION FOR PRELIMINARY INJUNCTION

#### A. Applicable Law

"[I]t is well settled in this circuit that applications for preliminary injunctions and temporary restraining orders are generally measured against the standards set forth in *Dataphase Sys[tems], Inc. v. C L Sys[tems], Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*)." *McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.*, 361 F. Supp. 2d 912, 918 (N.D. Iowa 2005) (Bennett, C.J.). The four *Dataphase* factors include "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase*, 640 F.2d at 114. In discussing how a court should apply these factors, and particularly the third factor, the *Dataphase* court explained:

> The very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability test. At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined. [FN5] The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case. Thus, an effort to apply the probability language to all cases with mathematical precision is misplaced.

> > [FN5] The controlling reason for the existence of the judicial power to issue a temporary injunction is that the court may thereby prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated. [Citations omitted.]

> In balancing the equities no single factor is determinative. The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined

in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

It follows that the court ordinarily is not required at an early stage to draw the fine line between a mathematical probability and a substantial possibility of success. This endeavor may, of course, be necessary in some circumstances when the balance of equities may come to require a more careful evaluation of the merits. But where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.

*Dataphase*, 640 F.2d at 113.

"A district court has broad discretion when ruling on requests for preliminary injunctions, and [the appellate court] will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion." *McLeodUSA Telecomm. Servs., Inc.*, 361 F. Supp. 2d at 918 (citations, internal quotation marks omitted).

## B. Consideration of the Dataphase Factors

There is no real dispute that Great Lakes would suffer severe and irreparable harm if the requested preliminary injunction is not granted. Great Lakes has been assigned 12,000 telephone numbers by NANPA, and if the injunction is not granted, Neustar will reclaim all of them. This would put Great Lakes out of business almost immediately.

It is equally clear that the balance of harm between the parties strongly favors Great Lakes. For harm to them, Qwest and Sprint point to the fact that access charges are accruing while this matter is pending. Qwest and Sprint are not paying these charges, and

clearly they do not intend to pay them in the future unless they are ordered to do so by a some judicial authority. The only other harm claimed is from increased traffic over their telephone lines resulting from Great Lakes's operations, but this harm has not been established or quantified in this record.

Qwest and Sprint argue that the public interest weighs against the granting of injunctive relief, but they have cited no authority that would come close to tipping the balance in their favor in light of the irreparable harm Great Lakes would suffer if injunctive relief is not granted.

Considering only these three factors, the *Dataphase* analysis favors the granting of injunctive relief. However, under the decision of the Eighth Circuit in *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir.2008) (en banc), the likelihood of the movant's success on the merits must be considered first, as a threshold matter, before a consideration of the weight of the other factors.

In *Planned Parenthood*, the court modified the standards for considering the likelihood of success on the merits in cases where, as here, the requested injunctive relief would stay governmental action pursuant to a regulatory scheme. *Id.*, 530 F.3d at 731-32. This change was described by the court in *Williams v. Timothy F. Geithner*, slip op., 2009 WL 3757380 (D. Minn., Nov. 9, 2009), as follows:

> When considering whether to grant a preliminary injunction seeking to stay government action taken in the public interest pursuant to a statute or regulatory scheme, courts require "a substantial likelihood" rather than merely a "fair chance" that the moving party will prevail on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008) (en banc) (citing *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)). This rigorous standard reflects the notion "that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of

> deference and should not be enjoined lightly." *Able*, 44 F.3d
> at 131. Once the moving party satisfies its threshold showing
> likelihood of success on the merits, only then should courts
> consider the other *Dataphase* factors. *See Planned
> Parenthood*, 530 F.3d at 732.

*Williams*, 2009 WL 3757380 at *5.

Therefore, regardless of the weight of the other three factors, in order to obtain injunctive relief, Great Lakes must show a substantial likelihood that it will prevail on the merits. To make this showing, Great Lakes must demonstrate that the IUB improperly ordered Neustar to reclaim Great Lakes's telephone numbers, or the IUB lacked the jurisdiction or authority do so.

The FCC regulations provide, "The NANPA and the Pooling Administrator shall abide by the state commission's determination to reclaim numbering resources if the state commission is satisfied that the service provider has not activated and commenced assignment to end users of their numbering resources within six months of receipt." 47 C.F.R. § 52.15(i)(5). Federal law permits the FCC to delegate this authority to state commissions. 47 U.S.C. § 251(e)(1).

In this case, the IUB held that Great Lakes's FCSC customers were not "end users" for intrastate purposes. The term "end user" is not defined in the Iowa regulations, but because the definitions in the NECA interstate access tariff are incorporated in the applicable Iowa intrastate tariff, the IUB purported to relied on the NECA definition of the term for intrastate purposes. *See* IUB Order, Doc. No. 1-2, pp. 17-18. The IUB quoted a provision of the NECA tariff that provides, "The Telephone Company will provide End User Access Service (End User Access) to end users who obtain local exchange service from the Telephone Company under its general and/or local exchange tariffs." The IUB found that "[t]his condition must be met if an entity is to be considered an end user under [Great Lakes's] switched access tariffs." *Id*. at 20. The IUB concluded "that the FCSCs did not subscribe to the services in [Great Lakes's] access and local exchange tariffs and

therefore are not end users of [Great Lakes]." *Id*. at 24. This is because the FCSCs "did not expect to pay for and did not pay for any of [Great Lakes's] local exchange service offerings." *Id*. at 34.

The court disagrees with this conclusion. The NECA provision cited by the IUB does not purport to define the term "end user," and certainly does not state that end users must pay for the telephone companies' local exchange service offerings. Instead, it specifies one subset of "end users" to whom a telephone company will provide End User Access Services. Implicit in the provision is that there are end users who do not obtain local exchange service from the Telephone Company under its tariff.

Furthermore, the IUB's conclusion is contrary to the holding in *In re Qwest Communications Corp. v. Farmers and Merchants Mutual Telephone Co.*, 22 F.C.C.R. 17973, 2007 WL 2872754 (F.C.C. Oct. 2, 2007), a case directly on point in the present controversy. The court is unpersuaded by the defendants' effort to discredit this ruling. In *Farmers and Merchants*, the FCC held that "the conference calling companies *are* end users as defined in the [Farmers and Merchants tariff][.]" *Id*., 2007 WL 2872754 at *10, ¶ 35 (emphasis in original). The Farmers and Merchants tariff defined "'end user' as 'any customer of an interstate or foreign telecommunications service that is not a carrier,' and in turn defines 'customer' as any entity 'which subscribes to the services offered under this tariff.'" *Id*., ¶ 36. This definition mirrors the definition of "end user" in the NECA tariff. Farmers argued its conference calling companies were "customers" under the tariff "because they purchase interstate End User Access Service and pay the federal subscriber line charge." *Id*., ¶ 37. Qwest argued the conference calling companies did not "subscribe" to the services offered under the tariff because they effectively paid nothing for the service. *Id.*

The FCC found that the conference calling companies' status as "subscribers" to the services offered under the tariff was not based on whether the FCSCs paid Farmers a fee for the subscription services. The FCC expressly "reject[ed] Qwest's premise that the

conference calling companies can be end users under the tariff only if they made net payments to Farmers. The question of whether the conference calling companies paid Farmers more than Farmers paid them is thus irrelevant to their status as end users." *Id.*, ¶ 38.

Qwest subsequently petitioned the FCC for reconsideration of its decision, arguing new evidence showed that Farmers had improperly backdated contracts with the conference calling companies to make it appear they had purchased tariffed services. The FCC granted Qwest's petition for reconsideration, ordered supplemental evidence, and directed Farmers to provide further discovery. *In re Qwest Comm. Corp. v. Farmers & Merchants Mut. Telephone Co.*, 23 F.C.C.R. 1615, 2008 WL 246393 (F.C.C. Jan. 29, 2008). In the Order on Reconsideration, the FCC stated, "We take no view at this time as to whether [the new evidence] will persuade us to change our decision on the merits, but we believe that it is important to consider all the facts underlying this case." *Id.*, 2008 WL 246393 at *2, ¶ 6. The FCC has issued no further opinion on Qwest's petition for reconsideration. However, this court finds it highly unlikely that the new evidence will change the FCC's ruling with regard to whether or not conference calling companies can be "end users" under the applicable tariffs. The FCC's analysis of the issue would remain valid even if the agency finds Farmers fraudulently backdated its contracts.

Relying on its own contrary definition of "end user," and its interpretation of the authority granted in 47 C.F.R. § 52.15(i)(5), the IUB directed NANPA and the Pooling Administrator to commence reclamation of Great Lakes's numbering resources. The IUB ruled that Great Lakes had served only FCSCs since receiving its certificate in 2005, and Great Lakes should not have numbers activated purely for FCSC use. IUB Order at 66-67. In so doing, the IUB overreached its authority.

Section 52.15(i)(5) delegates to state commissions, such as the IUB, the authority to determine whether telephone companies have "**activated and commenced assignment**" to "**end users**" of telephone numbers assigned to them within six months of receiving the

numbers. If a telephone company has not complied with this requirement, the state commission has the authority under the regulation to order NANPA to reclaim the numbers from the company. The IUB based its ruling on the erroneous conclusion that Great Lakes's FCSCs were not "end users," so the underpinning of its ruling does not hold.

The IUB did not reach the second important determination under section 52.15(i)(5); i.e., whether Great Lakes "activated and commenced assignment" of the telephone numbers. Qwest and Sprint argue Great Lakes did not activate or commence assignment of the numbers because they were put in service in Spencer, an exchange where Great Lakes did not have a tariff, and not in Lake Park or Milford. They further argue the numbers were not activated properly because Great Lakes's FCSC customers had no presence in Spencer, Lake Park, or Milford, so the numbers were not put in service in any of those locations. They argue the meaning of the phrase "activated and commenced assignment to end users" for purposes of reclamation is best understood by looking at how those numbering resources were obtained in the first place. *See* Sprint resistance, Doc. No. 52, p. 8.

The regulations relied on to support this argument strongly suggest that NANPA would not have issued the numbers to Great Lakes if it had known they would not be placed in service in Lake Park or Milford, but in Spencer, where Great Lakes had no authority. However, these regulations all relate to the determination by NANPA of whether to issue the numbers in the first instance. They do not provide any understanding of the delegation of authority to state commissions in section 52.15(i)(5).

Section 52.15(i)(5) is a regulation granting state commissions the authority to determine whether a telephone company is using telephone numbers assigned to it, and if not, to have NANPA commence procedures to reclaim them. The obvious purpose of this regulation was to give state commissions the authority to reclaim telephone numbers that are not being used so they can be put in service by someone else. Such authority furthers the "two primary goals" related to the FCC's plenary jurisdiction over the North American

26

Numbering Plan; i.e., to ensure that the limited numbering resources of the NANP are used efficiently for the benefit of both consumers and carriers, and to ensure that all carriers have the numbering resources necessary to compete in the rapidly growing telecommunications marketplace." *In re Global NAPs California, Inc.*, No. EB-08-IH-5265, FCC Notice and Order dated Nov. 12, 2009 (supplemental authority submitted by Great Lakes via email because of the unavailability of the court's ECF filing system).

To say the telephone numbers provided to Great Lakes were not assigned or activated turns the regulation on its head. Qwest and Sprint are attempting to expand a regulation that authorizes state commissions to initiate the reclamation of unused numbers to give the state commission the authority to litigate and reclaim numbers the commission believes were issued wrongfully or are not being put to an authorized use. The IUB does not have this authority.[6]

Because the IUB acted outside the scope of its authority in ordering Neustar to reclaim the numbers issued to Great Lakes, it would appear, at this early stage of the litigation, that Great Lakes is likely to prevail in overturning Clause 7 of the IUB's Order. Therefore, for purposes of the *Dataphase* analysis, the balance is tipped in favor of Great Lakes and a preliminary injunction should issue.

This conclusion, however, in no way intimates that Great Lakes will be able to retain its certificate of public convenience, or that Qwest will not prevail on its motion to dismiss. There are other factors that must be considered in connection with Qwest's motion to dismiss that are too numerous and complex for full analysis given the limited

---

[6]Great Lakes also suggests the IUB failed to comply with applicable FCC mandates regarding how it may reach a determination that numbers should be reclaimed. The regulations provide that when a state commission, NANPA, or the Pooling Administrator believe a service provider may have violated FCC rules, orders, or applicable industry guidelines, then a "for cause" audit must be requested in accordance with the procedures set forth in the regulations. *See In re Global NAPs California, Inc.*, cited above, at ¶ 4 (citing 47 C.F.R. § 52.15(k)(1). Great Lakes argues those procedures were not followed in this case. A detailed analysis of the regulations and whether the IUB complied with them is beyond the scope of this Report and Recommendation.

time frame within which the court must rule on the motion for preliminary injunction. Chief among these are whether this court should abstain from hearing this dispute under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971); *see Middlesex County Ethics Commission v. Garden State Bar Association*, 457 U.S. 423, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (1982); and whether Great Lakes is estopped from obtaining equitable relief based on the "clean hands" maxim. *See Precision Instrument Mfg. Co. v. Automotive Maint. Mach.*, 324 U.S. 806, 65 S. Ct. 993, 89 L. Ed. 1381 (1945); *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S. Ct. 146, 78 L. Ed. 293 (1933).

The undersigned will prepare a separate Report and Recommendation on Qwest's motion to dismiss/transfer/reassign. With regard to Great Lakes's motion for preliminary injunction, however, for the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files timely objections[7] to this Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b),that the motion be granted, and a preliminary injunction be issued to prohibit the enforcement of Clause 7 of the IUB Order.

The time for the parties to object to this Report and Recommendation is hereby shortened from the ten days ordinarily allowed. Objections must be filed **by 4:00 p.m.**

---

[7]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.

on **Friday, November 20, 2009.** Any responses to objections must be filed **by 9:00 a.m. on Monday, November 23, 2009**.

      **IT IS SO ORDERED.**

      **DATED** this 17th day of November, 2009.

                  PAUL A. ZOSS
                  CHIEF MAGISTRATE JUDGE
                  UNITED STATES DISTRICT COURT